# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

RELIASTAR LIFE INSURANCE COMPANY,

        Plaintiff/Counter-Defendant,

v.                                              CIVIL CASE NO. 06-10479
                                                HON. MARIANNE O. BATTANI

CATHIE NOAKE SLEIGHT,

        Defendant/Counter-Plaintiff.

_____/

## OPINION AND ORDER GRANTING DEFENDANT/ COUNTER PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND DENYING PLAINTIFF/COUNTER DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

**I.    INTRODUCTION**

Before the Court are Plaintiff's and Defendant's Cross Motions for Judgment on the Administrative Record (Doc. ##19 & 20). Plaintiff filed suit seeking reimbursement for payments it made to Defendant under a long-term disability policy. Defendant removed the case from state court. Defendant filed a motion to declare void Plaintiff's denial of continuing disability benefits and a counterclaim seeking to reinstate her benefits under 29 U.S.C. § 1132 (a)(1)(b).

**II.    STATEMENT OF FACTS**

Cathie Noake Sleight ("Sleight") worked as a technical analyst for General Motors Corporation, employed by Kelly Services as a leased employee, until July 8, 2000. Admin. R. 650-652. Sleight terminated her employment with Kelly Services in January of 2000 because

1

she was diagnosed with acoustic nueroma, a benign brain tumor. Subsequently, she underwent three surgeries in August of 2000, November 2000, and February 2001, in an effort to remove the tumor. Admin. R. 429. After her surgeries, Sleight was impaired on her left side. Specifically, she was diagnosed with a condition known as Reflex Sympathetic Dystrophy ("RSD"). Admin. R. 332. Her symptoms included severely restricted movement on her left side, as well as some visual and hearing impairment. Admin. R. 313.

Sleight was seen and treated by Dr. Marc Davis at the McClaren Ambulatory Care Center on several occasions for over a year after her surgeries. Admin. R. 313-314, 332-335. On December 6, 2002, Dr. Davis evaluated Sleight and completed a Physical Capacities Evaluation. Admin. R. 313, 315-316. Dr. Davis acknowledged her physical impairments, but found that she was capable of sitting for 6-8 hours during the workday. Admin. R. 315. He, however, noted that Sleight would be unable to work either full or part-time. Id.

ReliaStar Life Insurance Company ("ReliaStar") issued a group long-term disability policy ("the Policy") to Kelly Services, Inc. ("Kelly"), with ING Employee Benefits as its administrator ("ING"). The Policy is an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq. ("ERISA"). The Policy provided long-term disability ("LTD") coverage to Kelly employees, including Sleight. The Policy pays for monthly benefits when an employee is "Totally Disabled." Admin. R. 752.

The Policy defines "Totally Disabled" in two respects. First, during the initial 24 months, the claimant must be unable to perform his or her "own occupation" and thereafter, under the more restrictive "any occupation" standard, the claimant must demonstrate the inability to perform all of the essential duties of any gainful occupation and not be able to work

2

at all. The Policy defines "gainful occupation" as "any occupation that your training, education, and experience would allow you to perform" and pays a monthly benefit equal to 60% of the claimant's monthly salary. Admin. R. 766.

On December 6, 2000, Sleight applied to ReliaStar for disability benefits, claiming disability due to acoustic neuroma. The following month ReliaStar advised Sleight that it had approved her claim for long-term disability benefits effective January 6, 2001. Admin. R. 229. ReliaStar stated in its approval letter that Sleight must continue to meet the policy definition of "Totally Disabled," in order to qualify for benefit payments quoted in the Policy language. ReliaStar also notified Sleight that she may be eligible for Social Security Disability Insurance ("SSDI") benefits and that such benefits would be considered an offset to any Policy benefits. Admin. R. 229-230.

On July 25, 2001, Sleight was advised that ING determined it was appropriate for her to file for social security disability benefits. An application was submitted on October 26, 2001. Admin. R. 213. Social Security Benefits were paid for a period from January 2001, through October 2001, and then were terminated. ING appealed the termination on behalf of Sleight. Id. On July 28, 2003, an administrative hearing was held in Flint, Michigan to consider Sleight's appeal. Admin. R. 566. On December 23, 2003, the Social Security Administration issued a "fully favorable" decision to Sleight, overturning its initial decision to terminate Sleight's benefits. Admin. R. 562-563.

On October 25, 2002, ReliaStar wrote Sleight a letter informing her that after January 6, 2003, her continued disability benefit would be based on whether she was disabled from any occupation. Admin. R. 183-184. ReliaStar then conducted a re-review of the claim to determine

3

whether Sleight was unable to perform any occupation. As part of its standard review practice, ReliaStar requested that Sleight complete and return an Activities of Daily Living Questionnaire. Admin. R. 184. On March 6, 2003, at ReliaStar's request, Sleight underwent a Functional Capacities Evaluation ("FCE") at Michigan Spine Care with Registered Occupational Therapist Kathy Enghoffer to ascertain her functional ability to work. After reviewing Sleight's medical records, and the results of the FCE, Enghoffer concluded that Sleight was capable of working an 8-hour day in the sedentary physical demand category. Admin. R. 259.

Based upon Enghoffer's conclusion, ReliaStar retained a firm known as Vocational Directions to conduct a Labor Market Survey to evaluate whether Sleight was "gainfully employable" in other occupations. In its analysis, Vocational Directions considered Sleight's physical limitations. Vocational Directions identified a number of sedentary positions available within a 50-mile radius of Sleight's home she would be qualified for based on her past education and work experience. Admin. R. 176-181. After considering the FCE and the Labor Market Survey, along with all other records in the file, ReliaStar determined that Sleight was no longer eligible for long-term disability benefits under the Policy because she was no longer disabled from "any occupation." Consequently, on September 4, 2003, ReliaStar notified Sleight by letter that her benefits would terminate effective September 6, 2003. Admin. R. 160-162. ReliaStar advised her that she could appeal its decision and provided a description of the appeals process. Admin. R. 160-162.

On February 12, 2004, Sleight appealed ReliaStar's denial of her claim. Admin. R. 157-158. Her appeal claimed that she was unable to work an eight-hour day in a sedentary position, and included an Independent Medical Evaluation ("IME") prepared by Dr. Paul LaClair

4

dated September 29, 2003. Admin. R. 163-164. This IME had been prepared at the request of the Social Security Administration during its review of her claim. The IME noted that Sleight had "ongoing neurological deficits" and "significant functional limitations due to these issues." Admin. R. 164. Dr. LaClair added that Sleight has "limited sitting and standing tolerance due to weakness, balance issues and also pain complaints through the back and left leg." Id.

Sleight also included in her appeal a July 1, 2003, report from Dr. Brian Beck stating that she is disabled under the Social Security Act. Admin. R. 165-166. Dr. Beck noted that Sleight was disabled under Section 1104B which defines the disability as: "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." Admin. R. 165.

Along with her appeal, Sleight requested a copy of her claim file and documents used by ReliaStar in its decision. Admin. R. 155. In response, on February 27, 2004, ReliaStar sent her a copy of the claim file and allowed Sleight to review the file and to submit any additional documentation to support her appeal. Id. ReliaStar sent two additional letters dated March 29, 2004, and April 28, 2004, to Sleight informing her that she may provide additional documents to support her appeal. Admin. R. 154-155. Sleight did not provide any additional documents. On May 14, 2004, ReliaStar's Appeals Committee advised Sleight that it was upholding its denial of her claim. Admin. R. 147-148.

## III. STANDARD OF REVIEW

The Sixth Circuit has held that an ERISA plan administrator's denial of benefits should be reviewed de novo where the plan administrator has no discretion to determine benefits eligibility. Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 613 (6th Cir. 1998). On the

5

other hand, when a plan administrator has discretionary authority to provide benefits, the court must review a decision to deny benefits under "the highly deferential arbitrary and capricious standard of review." Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 380 (6th Cir. 1996). The parties in this case agree that the plan at issue gives the plan administrator such discretionary authority. The plan specifically grants ReliaStar "final discretionary authority to determine all questions of eligibility and status and to interpret and construe the terms of [the policy]." Admin. R. 772.

"The arbitrary and capricious standard is the least demanding form of judicial review of administrative action." Williams v. Int'l Paper Co., 227 F.3d 706, 712 (6th 2000). A plan administrator's decision will be upheld under the deferential arbitrary and capricious standard if that decision is "rational in light of the plan's provisions." Univ. Hosp. v. Emerson Elec. Co., 202 F.3d 839, 846 (6th Cir. 2000). "When it is possible to offer a reasoned explanation, based on evidence, for a particular outcome, that outcome is not arbitrary or capricious." Davis v. Ky. Fin. Cos. Ret. Plan, 887 F.2d 689, 693 (6th Cir. 1989).

**IV.    ANALYSIS**

"Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 169 (6th Cir. 2003). Moreover, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan

administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). However, "the highly deferential standard of review applicable in this case does not automatically mandate adherence to" the administrator's decision. McDonald, 347 F.3d at 172. The district court is obligated "to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously in making ERISA benefit determinations. This obligation inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." Id.

In this case, the medical evidence and opinions consists of the findings of three medical doctors and the results of an FCE administered by ReliaStar. The first piece of medical evidence is from Dr. Marc Davis at the McClaren Ambulatory Care Center. Dr. Davis examined and treated Sleight on several occasions for over a year after her surgeries. Admin. R. 313-314, 332-335. Although no special weight may be afforded to the opinions of the claimant's physician, Dr. Davis, in his December 6, 2002, Physical Capacities Evaluation ("PCE"), opined that although Sleight was capable of sitting for 6-8 hours during the workday, she would not be able to work either full or part-time due to her limitations. Admin. R. 315.

Next, is the opinion of occupational therapist Kathy Enghoffer at Michigan Spine Care. Enghoffer concluded that Sleight was capable of working an 8-hour day in a sedentary position after reviewing Sleight's medical records and the results of the FCE.

Third, is an Independent Medical Evaluation by Dr. Paul LaClair. In his IME, dated September 29, 2003, Dr. LaClair noted that Sleight had "ongoing neurological deficits" and "significant functional limitations due to these issues." Admin. R. 164. Dr. LaClair added that

7

Sleight has "limited sitting and standing tolerance due to weakness, balance issues and also pain complaints through the back and left leg." Id. ReliaStar asserts that because Dr. LaClair did not specifically state that Sleight would be unable to hold a sedentary job that no conclusions can be drawn from Dr. LaClair's IME about her ability to have such a position. However, ReliaStar cannot gain any support for its conclusion that Sleight is able to hold a sedentary job from Dr. LaClair's IME, especially his opinion that Sleight has a limited tolerance for sitting and standing.

Finally, Dr. Brian Beck stated in a July 1, 2003, report that Sleight is disabled under the Social Security Act. Admin. R. 165-166. Dr. Beck noted that Sleight was disabled under § 1104B which defines the disability as: "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." Admin. R. 165. Although ReliaStar correctly points out that Dr. Beck did not address his thoughts on whether Sleight would be capable of working a sedentary job, Dr. Beck's conclusion that Sleight is disabled under the Social Security Act certainly provides no medical evidence for ReliaStar's assertion that Sleight is employable in a sedentary job.

As to the Social Security Administration's ("SSA") disability determination and the impact that it should have on ReliaStar's decision, "the SSA's disability determination does not, standing alone, require the conclusion that [Defendant's] denial of benefits was arbitrary and capricious . . . ." Calvert v. Firstar Finance, Inc., 409 F.3d 286, 295 (6th Cir. 2005). However, "[h]ere, the SSA determination, at a minimum, provides support for the conclusion that an administrative agency charged with examining [Plaintiff's] medical records found, as it

8

expressly said it did, objective support for [treating physician's] opinion in those records." Id., at 294. Although the SSA initially decided to terminate Sleight's benefits, it overturned its initial decision on December 23, 2003, and issued a "fully favorable" decision to Sleight. Admin. R. 562-563. The SSA based its review of Sleight's appeal in part on the medical evidence provided, including the opinions of Drs. Davis, LaClair, and Beck. Thus, under the reasoning of Calvert, the SSA's "fully favorable" decision would lend objective support for the opinions of these physicians.

ReliaStar claims to have upheld the termination of Sleight's benefits upon reviewing all of the medical and vocational evidence in her file. However, ReliaStar's decision does not comport with the quality and quantity of the medical evidence. See McDonald, 347 F.3d at 172. The FCE is the foundation for ReliaStar's decision to uphold the termination because it is the only document in the Administrative Record which specifically states that Sleight is capable of working an 8-hour day. Although a court cannot ordinarily deem a decision to deny benefits arbitrary and capricious if that decision is based on the medical opinion of a doctor, in this case, no doctor rendered such an opinion. Id., at 169. Thus, no licensed doctor opined that Sleight is capable of working an 8-hour day. ReliaStar could have sought the evaluations and opinions of a doctor to support its termination of benefits and discount the opinions of Drs. Davis, LaClair, and Beck. It did not do so, raising "questions about the thoroughness and accuracy of the benefits determination." Calvert, 409 F.3d at 295. Therefore, in light of the "quality and quantity of the medical evidence" in the Administrative Record, this Court concludes that ReliaStar has not offered a reasoned explanation for its decision to terminate benefits.

## V. CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Defendant/Counter Plaintiff's Motion for Judgment on the Administrative Record is **GRANTED. IT IS FURTHER ORDERED** that Plaintiff/Counter Defendant's Motion for Judgment on the Administrative Record is **DENIED.**

**IT IS SO ORDERED.**

                                    s/Marianne O. Battani
                                    MARIANNE O. BATTANI
                                    UNITED STATES DISTRICT JUDGE

DATED: July 25, 2007

## CERTIFICATE OF SERVICE

Copies of this Order were served upon counsel of record on this date by ordinary mail and/or electronic filing.

                                    s/Bernadette M. Thebolt
                                    DEPUTY CLERK